# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NO. 06-275 (JR)** |
| | **:** | |
| **GAYDEN C. WOODSON,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant Gayden C. Woodson is scheduled to be sentenced on January 31, 2007, upon his plea of guilty to a one-count criminal Information charging him with engaging in a conspiracy to commit theft of government property (18 U.S.C. §641) in violation of 18 U.S.C. §371. The statutory maximum sentence of imprisonment is five years. For the reasons set forth in this memorandum, the government submits that the Court should (1) apply, as advisory, the United States Sentencing Guidelines calculation reached in the Probation Office's Presentence Investigation Report (PSIR), and (2) sentence the defendant within the Guidelines level 20 range, to a term of imprisonment for between 33 and 41 months, followed by a three-year term of Supervised Release, and to make restitution of $350,000. The defendant has not previously been incarcerated in this matter.

### Background: The Guidelines Calculation

As set forth in the PSIR, the appropriate Guidelines calculation is a Base Offense Level of 6 (U.S.S.G. §2B1.1(a)), increased by 12 for the amount of illegal proceeds (U.S.S.G.

§2B1.1(b)(1)(G)), and by an additional 2 for Abuse of a Position of Trust (U.S.S.G. §3B1.3).[1]

The government agrees that the defendant is entitled to a 2-level reduction for Acceptance of

Responsibility (U.S.S.G. §3E1.1(a)).

However, because the defendant engaged in obstructive conduct after he entered his plea –

which he does not deny, and is as explained below – the government will not move for an

additional third-point reduction for Acceptance of Responsibility (U.S.S.G. §3E1.1(b)).

Moreover, the government endorses the Probation Office's recommendation that his Guidelines

be increased by 2 for Obstruction of Justice (U.S.S.G. §3C1.1).  The resulting Total Offense

Level, for sentencing purpose, is 20, which at the applicable Criminal History Category of I calls

for imprisonment for between 33 and 41 months.

**The Guidelines Calculation Accurately Reflects
the Seriousness of the Defendant's Offense**

**1.  Woodson's offense conduct is accurately
reflected in the Guidelines calculation.**

Gayden Woodson worked for the United States Department of Defense, Defense

Reutilization and Marketing Service (DRMS), for nearly 27 years, from the time he was 19 until

he resigned after being confronted with, and acknowledging, the evidence of his criminal conduct

in this case.  He served as a DRMS property disposal specialist – a person entrusted with the

responsible disposition of United States military surplus items.  He knew full well that the

military surplus equipment processed by DRMS, as well as any proceeds from sales of that

---

[1]  In the plea agreement, both parties agreed on a particular United States Sentencing Guidelines calculation.  After signing the plea agreement, but before entering his plea, Gayden Woodson made additional admissions to having received a substantially greater amount of illegal proceeds, and he ratified these admissions during the plea proceeding.  This had the effect of increasing the Guidelines calculation based on the amount of illegal proceeds.

equipment, were United States government property.  He also knew that *militarized* surplus items had to be de-militarized – rendered incapable of use as a militarized item – before disposal, and that  "non-de-mil'd" militarized items could not be exported – that is, sold to foreign nationals abroad – without validated export licenses issued by the United States Department of State's Directorate of Defense Trade Controls.

From November 2000 to May 2006, Woodson was assigned to serve as a Property Disposal Specialist in Abu Dhabi, United Arab Emirates (UAE), responsible for receiving, managing, and disposing of surplus military property (and hazardous waste) at various United States military bases and camps throughout the Middle East.  In that capacity, he functioned with a great deal of autonomy.  During the first few months of this period, Woodson worked with Ronald W. Wiseman, another DRMS property disposal specialist who had been working there since mid-1999.[2]  At the time, Wiseman – along with foreign nationals engaged in running auctions and sales for DRMS, and involved in buying surplus property through those auctions and sales – were operating an scheme to siphon-off, from the DRMS inventory, United States military surplus items for illicit sale in transactions that were not reported, or were under-reported, to DRMS.  This scheme enabled the Wiseman to pocket substantial sums in illegal proceeds. Wiseman invited Woodson to join the corrupt enterprise.  Rather than refusing, and reporting the illegal activity, Woodson readily and willingly enlisted as an accomplice in the scheme.  When

---

[2] In 2005,Wiseman pled guilty in this District to conspiracy to violate the Arms Export Control Act, United States v. Ronald W. Wiseman, Criminal No. 05-152 (JR), and in the Eastern District of Texas at Texarkana to conspiracy to commit Theft of Government Property, United States v. Ronald Wiseman, 5:05(CR)14(1), for his role in the scheme described in this memorandum. After a substantial period of cooperation with the ongoing investigation, Wiseman was granted a downward departure, based on his substantial assistance, and sentenced to serve 18 months in prison.

Wiseman left the Middle East in April 2001, Woodson took over as the principal DRMS member of the illegal enterprise, and continued it until increased oversight of the DRMS operations (resulting in part from the investigation in this case) made it too difficult to conduct illegal transactions without detection. By that time, however, Woodson himself had reaped hundreds of thousands of dollars in illicit proceeds by stealing and selling off United States government property.

Although not a very high-ranking DRMS official, Gayden Woodson occupied a position of particular autonomy and authority – a position that afforded him the unsupervised freedom of movement and decision-making power that enabled him and his coconspirators to act without much risk of being detected.

It is also important to consider the substantial national security consequences of the conspirators' actions – of which Woodson, after over two decades of Defense Department service, was in a position to be well aware. As Woodson admitted after failing his post-plea polygraph (as explained below), among the items he and Wiseman sold to foreign nationals in this conspiracy were military High-Mobility Multi-Wheeled Vehicles (HMMWVs), some of which had battle-condition features including armor and gun turret-mount capabilities and thus were militarized. By putting militarized vehicles into an unregulated stream of foreign commerce, in a part of the world in which United States military personnel are engaged in deadly conflict with insurgency forces – the defendant put those vehicles within reach of adversaries who could use them against our own. Some of the HMMWVs illegally sold by the defendant and his coconspirators have been recovered in Kuwait and Germany, and transactions involving others have been traced to Spain, Czechoslovakia, and other countries. This has added substantially to the "force

protection" concerns of United States and allied military leadership, and risks the very lives of military men and women serving abroad.  The fact that the defendant did this for purely personal profit, over a period of years, makes his actions particularly reprehensible.

The Guidelines calculation in this case properly takes into consideration the seriousness of the criminal conduct to which the defendant has pled guilty.  The offense level applicable to the substantive violation in this case properly reflects the substantial sum of illegal proceeds the defendant reaped through his illegal activity.  In addition, because the defendant abused a position of trust, his conduct warrants a 2-level increase.

**2.    Woodson's obstructive conduct is correctly
        reflected in the Guidelines calculation.**

When Woodson was first confronted by agents in August 2006, and was shown documents relating to illicit DRMS transactions in which he had participated, he admitted being involved in the illegal scheme.  He stated, however, that he had only received about $100,000 in illegal proceeds, and that he had never knowingly sold militarized HMMWVs that had not been de-mil'd.  Later, after entering into the plea agreement – which required him to fully cooperate with the ongoing investigation – Woodson admitted that his illegal proceeds had actually amounted to approximately $350,000 (and it was based upon this sum that he entered his guilty plea).  In an extensive debriefing in the afternoon just following his October 24, 2006, plea proceeding, in the presence of his attorney, Woodson provided additional information about illegal transactions involving foreign nationals, but continued to steadfastly deny any actual knowledge of militarized HMMWV sales to foreign nationals (amounting to illegal unlicenced "exports").  At the end of t

his debriefing, Woodson affirmed that he had truthfully provided all information regarding his knowledge and involvement relative to the investigation.

On the next day, Woodson underwent a polygraph examination administered by the Defense Criminal Investigative Service, and was deemed deceptive. It was only *after failing this polygraph* that Woodson, through his attorney, finally informed the government that he did, in fact, know that a particular high-ranking officer of the Saudi Arabian military – who in a private capacity was an associate in the criminal scheme – had on two occasions bought quantities of HMMWVs, including militarized HMMWVs fitted with gun turrets, and that Woodson himself facilitated such illegal purchases for his own pecuniary gain.

Woodson's continued deception, and his failure of the polygraph, constitute a breach of the plea agreement, as well as obstruction of justice. For one thing, his continued deception frustrated the government's ability to fully pursue its ongoing investigation of foreign nationals who were associates in the Wiseman-Woodson scheme. For another thing, Woodson's continual lying undercuts his potential utility as a witness in any proceedings against other associates. The government submits that Woodson held back on his involvement in illegal exports of militarized HMMWVs because he well knew that admitting it would subject him to substantially greater criminal penalties.

Notwithstanding this, the government has determined that it will not seek to void the plea, and will not bring additional charges against Woodson, but instead will decline to move the Court to award him a third-level reduction for Acceptance of Responsibility, and will ask the Court to find that his obstructive conduct warrants a two-level increase for Obstruction of Justice.

### The Court should Apply the Guidelines Calculation, as Recommended by Booker

The Court can and should apply the stipulated Sentencing Guidelines calculation, even though it is no longer mandatory to do so, and accordingly should impose a sentence within the applicable Guidelines range.  The legal basis for this is as follows:

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 542 U.S. 296 (2004), and consequently invalidated the statutory provision that made the Guidelines mandatory: 18 U.S.C. §3553(b)(1). Booker, 543 U.S. at 244.  However, the Court expressly declined to invalidate the Guidelines in their entirety, and instead declared the remainder of the Guidelines to be the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime.  Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for imposing a sentence different from that provided for in the Guidelines.  See 18 U.S.C. §3554(c)(2).  Such a sentence will then be subject to appellate review for its "reasonableness".  Booker, 543 U.S. at 765.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines.  See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing).  "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when

sentencing." Booker, 543 U.S. 264 (citing 18 U.S.C.A. §§3553(a)(4)&(5) (Supp. 2004)).  In light of this mandate – as well as the continued requirement that the sentencing court explain in writing the basis for a sentence that falls outside of the Guidelines range, and the new "reasonableness" standard of review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se.  Not only is a sentence within the Guideline range presumptively reasonable, but it also accommodates the salutary goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines – intended to achieve the uniform and appropriate treatment of like crimes – represent the distillation of two decades of careful study of sentencing practices across the country, and closely correlate to the varying severities of crimes as defined by Congress.  The Guidelines, consisting of offense characteristics and various grounds for departure, address the relevant sentencing considerations set forth in §3553(a).  These considerations include, among others: "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  See United States v. Coles, 403 F.3d 764, 766 (D.C. Cir. 2005).

Indeed, the Sentencing Commission formulated the Guidelines only after first canvassing prior sentencing practice and undertaking to identify and assign weights to all the factors – aggravating and mitigating – that judges had long traditionally used in determining an appropriate sentence.  See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. §994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases").  Moreover, in the two decades since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns".  Booker, 543 U.S. at 263; see id. at 264 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions  . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by the sentencing court.  This view is shared by Congress and the Supreme Court.  As every Supreme Court Justice in the various opinions in Booker recognized, the Guidelines embody the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at 253 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 750 (same) ("Congress' basic statutory

goal – a system that diminishes sentencing disparity – depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction."); id. at 292 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 303-04 (dissenting opinion of Scalia, J.) ("[T]he primary objective of the Act was to reduce sentencing disparity.").

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness". See Booker, 543 U.S. at 261. Nevertheless, the Guidelines – resulting as they do from years of study of sentencing practices, crime statistics, and national crime policy, and of careful consideration of the factors that inform sentencing, see 18 U.S.C. §3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable. Booker does not allow courts to substitute their individual judgment about the appropriateness of the Guidelines range without justifying why their sentence takes the case outside of the heartland of situations already contemplated by the Guidelines. See 18 U.S.C. §§3553(c) (mandating consideration of the Guidelines) and 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. This is so, said the court in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that

carry out the purposes defined by Congress.  The resulting Guidelines, <u>Wilson</u> held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference. <u>Wilson</u> further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness.  For all of these reasons, a court should "give heavy weight to the recommended Guidelines sentence in determining what sentence is appropriate" and "[i]n the exercise of its discretion . . . only deviate from those Guidelines in unusual cases for clearly identified and persuasive reasons".  <u>Id.</u> at 925.  A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, all the facts supporting the proposed sentence have been admitted to by the defendant, or are uncontested by him.  Moreover, as made clear in the PSIR, no unusual circumstances exist that would warrant an exception to the preference for Guideline sentencing.  Therefore, the government respectfully recommends that the Court sentence the defendant within the Guidelines range at level 20 calculated in the PSIR.

### Conclusion

For all the foregoing reasons, the United States respectfully requests that the Court: (1) accept as advisory, and based in fact, the Probation Office's calculation of the Sentencing Guidelines applicable to the defendant, and (2) sentence the defendant within the Guidelines level

20 range, to a term of imprisonment for between 33 and 41 months, followed by a three-year term

of Supervised Release, and to make restitution of $350,000.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. Bar # 498610


By:

Laura A. Ingersoll, Assistant United States Attorney
Connecticut Bar # 306759
National Security Section
United States Attorney's Office
555 4th Street, N.W. – Room 11-844
Washington, D.C.   20530
202/514-9549
Laura.Ingersoll@usdoj.gov



Mariclaire Rourke, Trial Attorney
Connecticut Bar #405120
Counterespionage Section, National Security Division
United States Department of Justice
1400 New York Avenue, N.W. – 9th Floor
Washington, D.C.  20530
202/514-1208
Mariclaire.Rourke@usdoj.gov